973 So.2d 764 (2007)
Lionel E. TURNER, Sr.
v.
DELTA BEVERAGE GROUP/PEPSI AMERICA.
No. 07-CA-529.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2007.
*766 Diane K. Zink, Attorney at Law, La-Place, Louisiana, for Plaintiff/Appellee, Lionel E. Turner, Sr.
Virgil A. Lacy, III, Jayme P. Smith, Blue Williams, L.L.P. Attorneys at Law, Metairie, Louisiana, for Defendant/Appellant, Delta Beverage Group/Pepsi Americas, Inc.
Panel composed of Judges SUSAN M. CHEHARDY, FREDERICKA HOMBERG WICKER, and GREG G. GUIDRY.
SUSAN M. CHEHARDY, Judge.
This is a worker's compensation case in which the employer appeals a judgment in favor of the employee. We affirm.
Lionel E. Turner, Sr. claims he sustained back injury as a result of an on-the-job accident on February 5, 2004. He filed a disputed claim for compensation on January 25, 2005. He alleged he was injured while working as a filler operator for Delta Beverage Group/Pepsi Americas, Inc. (hereafter "Delta Beverage"). Turner asserted he was struck in the face by a pallet after the foreman hit a button to raise the pallet hydraulically; he claimed he was hit with such force that he was temporarily blinded and fell on his hip. He sought penalties and attorney's fees for denial of medical expenses, but did not seek weekly indemnity benefits.[1]
Delta Beverage did not deny either the existence of Turner's back injury, nor its severity, but challenged his claim that the back injury is causally connected to the accident of February 4, 2005. Delta Beverage disputed Turner's statement that he fell to the ground after the pallet struck him.
It is undisputed that. Turner continued to work at full duty for approximately one month following the incident of February 5, 2004, and did not complain of back pain to his supervisor or foreman at Delta Beverage. Turner's last day of work was March 5, 2004.
The matter was tried on February 15, 2007. On March 26, 2007, the OWC court rendered judgment. In the judgment the court found the employee met his burden of proving a causal connection between the February 5, 2004 work-related accident and his current back condition.[2] The court ruled that the employee sustained a work-related accident with injury on February 5, 2004 while in the course and scope of his employment with Delta Beverage Group/Pepsi Americas, Inc.; that his current back condition is the result of the work-related accident of February 5, 2004 and, as such, the employee is entitled to any reasonable and necessary medical treatment; and that the employer reasonably controverted the claim.
FACTS
Lionel Turner was the only person who testified at the trial. Testimony of other witnesses was submitted by deposition.[3]
Turner testified his regular job duties were as a two-liter filler operator. He worked the evening shift, from 3:00 p.m. until 11:30 p.m. On the evening of February 5, 2004, he was not working on the two-liter filler, but on a palletizer machine *767 instead. He knew how to operate practically any machine in the building, and occasionally he was asked to work on a different machine than the filler. The palletizer has a bin in which the forklift driver places loads of pallets. The machine automatically dispenses the pallets onto the conveyor to receive bottles in cases. The palletizer jams a lot, however, and when that happens the operator has to use a large steel crowbar (seven-to-eight feet long) to try to pry up the stuck pallets, because the palletizer works hydraulically.
At the time of the accident, Turner said, he was in front of the palletizer with the steel bar, trying to pry it up. He put the crowbar down while trying to push the pallet up manually. The night foreman, Darren St. Pierre, came from Turner's "blind side" and started operating the buttons on the side of the machine while Turner was in front of it. When the machine released the stuck pallet, St. Pierre was operating it manually from the side. As a result, the pallet "jumped out" with a loud bang, struck Turner in the left side of his face, and knocked him down to the floor. Turner said St. Pierre didn't see him at first. When he got around to where Turner was, Turner was in a kneeling position.
Turner said St. Pierre asked him, "What's wrong with you?" and Turner told him, "Hold on a minute, I can't see." St. Pierre asked Turner if he wanted to go in to sit in the office. Turner did so. While there he looked at his face, and saw his lip was cut on the left side. St. Pierre came to check on him and asked whether he wanted to go to the doctor. Turner told him no. He said at trial he didn't know to what extent he was hurt at the time. Turner said he sat for about an hour, then returned to work.
Asked about other employees who may have witnessed the accident, Turner said the forklift operator, Raymond "R.J." Tamplain, was in the general vicinity. When Turner got up after the accident, R.J. came around and put his hand on Turner's shoulder, and helped him get up.
Turner said after the pallet struck him he went down on his right cheek and hip. His eyes were wide open but he couldn't see. He could feel a warm, hot-burning feeling, a "warm clammy moist feeling." When he got up to his knees he was frightened because he couldn't see, even with his eyes wide open. He was concerned about his hip because he felt "that instantaneous burning sensation" on his back right hip.
His lip was split inside, all the way up to the gum, and a tooth was loose. By the next day, the lip was purple and swollen. He continued to work because he needed to work because of his responsibilities. He did not go to the doctor right away because he wasn't anticipating not being able to work. He didn't want any time off without a regular paycheck.
When he returned to work after the accident, he could not perform his job as well as before. As a filler operator, Turner had to load a bin with bottle caps every 20 to 30 minutes, which required him to walk about 25 feet and dump a box of caps into a bin. The boxes of caps weighed 40 to 60 pounds. He had to bend to lift the boxes of caps. He had to cut the box open, lift it up, and dump the caps in the bin. He had to oil the machine frequently, which required, stopping it and reloading it with oil. Occasionally when the machine jammed, he had to go underneath a three to three-and-a-half-foot high rail to unjam it, and had to unjam the machine from twenty to forty times a day.
It got to the point where he couldn't bend any more. He couldn't go under the *768 rail to check the filler. If he dropped something, a lot of times he couldn't pick it up. He walked around for "a long time . . . maybe three weeks" bent over, with everybody teasing him. He had to ask other people to pick up things he dropped. He had difficulty showering and dressing because he couldn't pick up his feet or bend over to put on his pants and tie his shoes. He continued for several weeks until he "just couldn't take it" any more. It was "very miserable."
He admitted that between February 5, 2004 and March 8, 2004, he never asked anyone at his job for permission to see a doctor. He wanted to continue to work and he thought he would feel better. When the pain got to where he couldn't functionhe couldn't bend either backward or forward, or stoophe knew he had to do something. He last worked at the company on March 5, 2004.
Turner went to the East Jefferson General Hospital emergency room on March 8, 2004, because the pain had become "excruciating, unbearable." He couldn't sleep, couldn't bend or stoop or move fast. He knew he couldn't go to work and function any more. The pain was so great he was actually groaning,
Turner admitted that when he went to the emergency room, he did not report his injury as a workers' compensation matter. He paid for it with his health insurance. He said that when asked if he had injured his back, he told them about the incident at work, and that the pain came about after that. He still wasn't sure what was happening to him.
Turner admitted he reported at the emergency room that the onset of back pain occurred about a week prior to his emergency room visit. He said he stated it that way because that was when it got to the point he couldn't take it any longer. That was the point when he couldn't function in his job anymore.
He said he did not tell the emergency room staff he fell to the ground when he was struck in the face with a pallet, because they did not ask for details.
Turner was questioned about his answers on a patient worksheet form he filled out for Advance Rehabilitation, a physical therapy center, on April 5, 2004. In it he described the onset/injury as having taken place 41 days earlier (which would fall on February 23, 2004). Turner said that was when he really began to experience excruciating pain and numbness in his legs. He stated he was progressively getting worse ever since February 5, 2004. He could not recall whether he told his physicians that he related his back pain to the fall after being hit in the face by the pallet
Turner said he applied for disability benefits rather than workers' compensation benefits because he had never been involved with workers' compensation before. In addition, he thought he was okay; he thought he was going to be out, but would come right back to work. He wasn't trying to extend his, time out from work, because he knew he needed to work. He had never previously had an on-the-job injury.
Turner never returned to work after March 2004. At the time of trial he was receiving Social Security disability benefits.
As for how the injury affected his ability to function, Turner stated he can't do any of the things he used to do. He cannot drive far, because it hurts his back to drive. If he sits too long, it hurts. If he stands too long, it hurts. If he lies in bed too long, the pain wakes him after a while and he has to change position or sit up. When he wakes in the morning, he wants *769 to get up and do something, but he can't and "that is miserable." He has two small children that he would love to spend time with, but he can't do things that require him to stand too long.
Turner said an orthopedic surgeon has recommended he undergo surgery at the L4-L5-S-1 vertebrae. Turner had not agreed to the procedure because he knew the trial was pending and he didn't want to be in a recuperating process that would have added pressure on him.
On cross examination, Turner said that St. Pierre was the foreman. He said St. Pierre did not fill out any report on the accident that evening. He admitted he did not say anything to St. Pierre about his back that evening, although he felt the burning and the clammy, moist feeling, because the extent of the injury was new to him and he had no idea what was going on. He had no idea what would be forthcoming.
Turner didn't speak to St. Pierre the next day, because the supervisor, Warren Lambert, took Turner off the production line to make an accident report. Lambert filled out a form and told Turner to call a toll-free telephone number to report the accident. Turner was not aware of St. Pierre having filled out an accident report. Turner could not recall what questions he was asked when he made the telephone report. He never received a copy of any reports.
Turner said after the accident, while he was working but feeling pain, he ran the filler machine while in a leaning-over position, because he couldn't stand up straight. He braced himself against a stool he had brought from home. Asked why he did not tell anyone he was having problems with his back, he said it was obvious and "they knew that." No one ever came to him and asked whether he wanted to take some time off. He needed to work and wasn't looking to have time off. He had never been in a situation like that before. Any days he missed from work would offset his income to the point where it disrupted his whole household.
Turner admitted he did not tell the emergency room personnel he had fallen down in the accident at work, nor about hurting his back in the accident. He said the notation "no recent trauma" was correct, because it wasn't recent. He also admitted that he did not call anyone at Delta Beverage to let them know he was going to the emergency room. He admitted that from the time of the accident on February 5 until he went to the emergency room on March 8, 2004, he never went to any doctors for anything having to do with his back. He didn't report any back injury to anyone at Delta Beverage. He went to see Dr. Larkin after the emergency room visit because East Jefferson referred him to Dr. Larkin. He admitted that in completing the patient information form for Dr. Larkin, he checked "no" in response to the question whether the injury was work-related and, for date of injury, he put "not applicable."
Turner stated he applied for short-term disability while still working at Delta Beverage because they told him to do so. He said, "I didn't know how things like this worked. .I had never been out on sick leave before. I wasn't going to apply for unemployment because I wasn't unemployed. So I applied for short-term disability." He said a lady in the office told him he was probably going to be out for a while and needed to apply for short-term disability. That was after he had been to see Dr. Larkin.
Asked why Dr. Sheldon Hersh's report said there was no history of trauma, Turner responded that Dr. Hersh didn't quiz him about any history. Turner did not *770 recall being asked about whether he had an accident. He did not tell the doctor how he had been hurt. He admitted he told the doctor the problem began in March 2004. He said the comment on Dr. Larkin's record that he had been having back pain for about a week was because "the severity of it was within that time." He said prior to that it was severe but not intolerable, but then it became intolerable.
Asked why he had not called as witnesses any of his former coworkers whom he said saw him working in pain, Turner responded that the one person he asked to testify, R.J. Tamplain, refused to do so because he felt he had been "blackballed" when he was fired shortly after Turner's accident. Turner said, "I didn't want to make his life any more miserable than it is out there."
Asked further about the differences in the dates the various doctors reported as to his onset of pain, Turner said he has a high tolerance for pain and has always bragged about how much pain he could tolerate, but by March he couldn't tolerate his pain any more.
Delta Beverage challenged Turner's testimony by pointing to various documents filed in evidence, as well as deposition testimony of other witnesses, that contradicts Turner's version of events.
Darren St. Pierre testified in deposition that on February 5, 2004, he was production foreman at Delta Beverage. At the time of Turner's accident, St. Pierre was sitting on a forklift, which he used to move materials around. The forklift was parked at the time. Turner was operating the palletizer. The palletizer was sticking, as usual, which required the operator to stick a shaft in and pry the pallets loose. A pallet hit Turner in the mouth. He was standing directly in front of where the pallets go into the machine. He looked in, the pallet got pushed up, and it popped him in the mouth. His lip and gum were bleeding, and a tooth was loose.
St. Pierre asked Turner whether he wanted to go to the hospital, but he declined. St. Pierre denied seeing Turner fall down. Asked whether Turner ever indicated he had hurt his back in the incident, St. Pierre said no. St. Pierre said he called the manager, then he filled out an accident report in Turner's presence. St. Pierre acknowledged there were additional notations on the form that he did not make. He did not know who made them. He said Turner showed him his cut lip and loose tooth, but never said anything else. St. Pierre did not recall whether he asked Turner what his specific injuries were. He based his notes on the form on what he observed for himself. He did not recall whether Turner's face later became swollen or discolored, nor did he recall whether Turner subsequently made any complaints after returning to work. St. Pierre did not recall ever asking Turner whether he had problems as a result of the incident.
St. Pierre also said he did not recall whether he himself hit a switch on the machine while Turner was trying to unjam the pallets. He admitted, "I might have to help him. . . . So whenever he pried it with the pipe, the bar, the pallets would break loose." He saw Turner get hit by the pallet, but did not recall seeing Turner go down to the floor on one knee. He did not know what he said to Turner afterwards. He did not recall if Raymond Tamplain was in the vicinity.
St. Pierre agreed that from where he was located he could see Turner standing in front of the palletizer, from an angle that would be the back of his head and the right side of his body. Asked again whether Turner fell down when the palletizer hit him in the face, St. Pierre said no. He admitted, however, that if Turner was *771 standing at the front of the palletizer, while St. Pierre was operating the buttons, St. Pierre would not have seen Turner. However, he said he did not recall whether he was operating the buttons when Turner was injured, but he did recall seeing the pallet hit Turner in the mouth.
As Turner testified, he first sought medical help at East Jefferson General Hospital's emergency room on March 7, 2004, complaining of back pain. The triage form indicates under "hx of complaint," "onset over 1 week with back pain pt reports unable to stand `unbearable constant pain' cannot stand for longer than 1 min." Under "past medical hx," the form states "none." It also states, under "examination," "History obtained from patient." In handwritten notes in the lower part of the form, "No recent trauma [illegible] 3-4 wk ago (struck in head [with] pallet at work)."
The printed Emergency Department Record by Ivan Sherman, M.D., states, "This 57 year-old black male presents to the emergency department with right sided lower back pain now for a week. He denies any recent trauma, however, he says 3 to 4 weeks ago, he was struck in the head with a pallet while at work. There was no loss of consciousness. He denies any blurred vision or dizziness. He says the back pain improves on standing and bending over."
Dr. Keith Larkin, an orthopedic surgeon, first saw Turner on March 9, 2004. Turner complained of soreness in lower back for two weeks. He worked at a bottling plant and couldn't do it because of his pain. He had no prior history of pain in his back. The doctor's notes did not express the patient reporting a fall at work, and the doctor did not recall his mentioning that. The doctor probably would have made a note if the patient had indicated he had had a fall or something else precipitating the onset of the pain.
The patient's report of when his back pain started would put the onset at about two weeks before he saw Dr. Larkin. Larkin said if the patient was hit in the face by a pallet in early February, but not knocked to the ground and did not fall down and did not have back pain until the last week of February, the doctor would not relate the pain to the accident. Assuming he did fall down, but did not report any back pain or injury until sometime in the last week of February, the doctor would still feel the back pain was not related. He would expect the symptoms to arise sooner than two-and-a-half to three weeks.
Dr. Keith Larkin referred Turner to Parish Pain Specialists, where he was treated by Dr. David Shawa. The Pain Assessment Form, dated 5/19/04, lists "Feb. 2004" under "When did it begin?" and continues, "3-4 wks prior to pain struck in face by pallet → fell to his knees." The Evaluation & Management Report by Dr. David Shawa, dated 5/19/04, states, "His pain started in February of 2003. He does not recall the precipitating events, but states that three to four weeks prior to the onset of his pain, he was struck in the face at work by a pallet causing him to fall backwards and then to his knees."
Dr. Robert Lesser, accepted by both parties as an expert in internal medicine, examined Lionel Turner on April 11, 2006. Turner told the doctor he was injured in 2/2004 on the job at Pepsi. Tests showed that by April 2006 Turner's degenerative disc disease with bulging discs, diagnosed in April 2004, had progressed to a ruptured disc with an extruded disc fragment. Dr. Lesser said it is possible and also medically probable that Turner's being struck in the face by the palletizer and knocked onto his right side could have caused the findings.
*772 According to Dr. Lesser, the fall could have caused the disruption despite the patient's not complaining about it until a month later, because people have different pain tolerances. He said, "A lot of what pain registers as is the meaning of the pain, and he may have played football or something, got whacked a bunch of times and said: Okay, this will be better in a day or two. . . . and it just persisted . . . and got gradually worse until it went past some threshold and he decided: Okay, this is not okay."
Dr. Lesser agreed it can be said that Turner has a higher tolerance for pain than the average back injury patient, because the amount of medication he was taking was less than many people take for that type of injury. He stated further he has seen patients whose back pain developed after-the acute event, and he thought such pain could develop anywhere from several days to weeks later. The doctor also agreed that pain from being struck in the face could have overshadowed pain in other regions of the body such as the back.
An August 17, 2004 report from Dr. Seymour Hersh directed to the Disability Determinations Service stated in pertinent part, "Problem. Back pain. Patient states this began in March 2004. There is no history of trauma."
Dr. Warren Bourgeois saw Turner on a referral from Dr. Larkin on November 29, 2004. Dr. Larkin had treated Turner from a conservative standpoint and referred him to Dr. Bourgeois for possible treatment by more invasive methods. The history Turner gave Dr. Bourgeois was that he had fallen on his right side when he was hit by a pallet in the left side of the face. Subsequently he had low back pain radiating to the right lower extremity. Dr. Bourgeois obtained that history from talking to Turner directly. Based on the history Turner gave, Dr. Bourgeois related his back pain to the event he described. Asked whether three weeks is normal for an onset of back pain in someone fell on their side as related by Turner, Dr. Bourgeois said it's possible for a disc injury to progress over time. However, it would be very unusual for there to be no pain for four weeks, and then all of a sudden pain if it's related to the injury that occurred four weeks before. He would expect there to be some pain that may gradually increase and become more evident over time. If there were no pain for four weeks after an injury, and all of a sudden there were pain, he would have trouble making a connection. However, he said he couldn't really answer the question without a history of when the pain began. Normally pain could start within an hour, within 24 hours, or within a couple of days, but not four weeks. If a fall caused the pain, Dr. Bourgeois would expect him to start noticing it within probably three days, a week at the outside.
On the other hand, if he was having a lot of facial pain or headaches, it could have made him overlook the back pain early on, until the other, more acute pain started to subside. After hearing counsel describe the action of the palletizer on Turner, the doctor said it's possible that amount of trauma could mask a secondary source of pain until the acute trauma healed. Within a week he should have had some stiffness, some achiness, and trouble moving around, and he would have noticed something by then.
Dr. Bourgeois said further that because the initial MRI showed degenerative changes, it's possible he had experienced some low back pain at some point before, so that could have played into his possibly ignoring any new or increased low back pain he felt initially after the accident. A fall such as was described by Turner could aggravate the progress of degenerative disc disease.
*773 Shown Dr. Larkin's patient information sheet, which indicated the injury was not work-related, Dr. Bourgeois commented, "[T]he patient's interpretation of whether or not it's work related I don't think is I'm not saying it's irrelevant. What's more relevant is the time line and the data of what actually occurred. This data doesn't sway my opinion or really add much to my opinion." He acknowledged, however, that assuming Turner was involved in an accident on February 4, 2004, he would have expected back injuries to have occurred before March 2004.
Dr. Bourgeois stated he recommended the patient undergo a lumbar microscopic diskectomy, which does not require a fusion. Turner declined the surgery and elected to continue conservative care under Dr. Colvin. Based on the data given him at the deposition, Dr. Bourgeois said he could not relate the back problems to the incident on February 4, 2004. Under a scenario in which Turner fell after being struck by the pallet, however, he could relate it. He agreed it's possible for trauma in one part of the body to mask pain from another injury. However, Dr. Bourgeois felt it unlikely that he could have sustained a serious enough injury to not recognize a herniated disc in his back.
Dr. Meda Colvin, who is board-certified in physical medicine and rehabilitation, and practices pain medicine, first saw. Lionel Turner on July 18, 2006. His complaint was low back pain and right leg pain since 2004. Her notes indicate it was from an accident at work with Pepsi, In addition, he had an exacerbation of it when he was thrown to the ground in an altercation with police on May 8, 2006,
Dr. Colvin had no opinion about whether Turner could have gotten a herniated disc from a blow to the mouth. After an injury that would result in a herniated disc, she would expect him to experience back pain by the next day at least. If he did not experience pain for several weeks after the incident, she would believe it less likely the incident is related to the back pain. Dr. Colvin said you would expect pain from a herniated disc to exhibit itself sooner than three weeks after an incident, but it doesn't always exhibit itself. She said you certainly could get a herniated disc from being struck in the head with a pallet, but it's hard to know without knowing the amount of force with which he was hit. She would not render an opinion on whether the February 5, 2004 accident was the cause of Turner's back problems. She noted he had the herniation before the 2006 altercation with police. She also said it can be very common for one injury to mask or override another injury. She agreed a lot of trauma to the face and mouth could override a back injury.
Dr. John Steck, a neurologist, saw Lionel Turn on July 27, 2006 for problems related to a herniated lumbar disc. He had been seeing Dr. Steck's associate, Dr. Colvin, who had treated him conservatively and felt he might need surgery. Dr. Steck did not document the patient's history, but simply referred to Dr. Colvin's history in his notes. Dr. Steck understood he had a back complaint related to a work incident, and then was in an altercation when he either fell or was thrown to the ground and developed increasing radicular pain. Dr. Steck said that after a traumatic incident that resulted in a herniated disc, he would expect the back symptoms to start within days, several days at longest. Asked whether being hit in the mouth with a pallet can cause a herniated disc in the back, the doctor replied, "Probably not." If the incident was February 4, Dr. Steck said, he would have difficulty relating it to the emergency room complaint on March 4.
*774 ASSIGNMENTS OF ERROR
On appeal Delta Beverage assigns the following errors: (1) The trial court was clearly wrong and"manifestly erroneous in finding that the employee established a causal connection between the February 5, 2004 work-related accident and his subsequent back condition; (2) the trial court erred in finding that Lionel E. Turner, Sr.'s back condition resulted from the work-related accident; (3) the trial court erred in disregarding the opinions of the initial treating physicians who were specialists in the field, regarding whether the back injury could be causally related to the February 5, 2004, accident.
Delta Beverage argues the overwhelming weight of the evidence shows that Turner's back condition was neither caused by nor related to the February 5, 2004 accident. The defendant asserts that Turner's claim he suffered a back injury from the accident was established as a medical improbability by Turner's various treating physicians and is contradicted by St. Pierre's testimony, the medical evidence, and by Turner's own accounts as provided to multiple individuals, including medical professionals on various occasions.
The defendant argues that St. Pierre's deposition testimony was neither impeached nor discredited. His testimony was taken after he left the defendant's employ and there was no showing he had any reason to give an inaccurate account of the incident. Further, defendant points out that Turner did not miss any work during the month after the accident, despite the physical nature of his work. He never complained of back pain to any supervisor, co-worker, or medical professional during the month following the accident, prior to his seeking treatment at the emergency room.
The defendant states that Turner's testimony, the documents he admits to filling out himself, and the story given to his doctors are "glaringly inconsistent" with his claim at trial that the onset of his back pain was contemporaneous with the accident and that he suffered in misery, evident to all around him, for over a month prior to seeking medical attention. The defendant contends there is nothing beyond Turner's self-serving, uncorroborated testimony to support his version of the facts, while numerous records and eyewitness testimony stand in contrast to his version of events and his claims of the severity of his injuries following the accident. Based on these arguments, the defendant asserts the trial court's ruling must be found to be manifestly erroneous and should be reversed.
Delta Beverage also argues that less weight should be given to the opinion of Dr. Lesser, who stated it is possible the fall could have caused the disruption without the patient complaining until a month later, because people have different pain tolerances. Delta Beverage points out that Dr. Lesser is an internal medicine specialist, not an orthopedist or neurologist, and did not begin to treat Turner until over two years after the accident. The defendant contends the opinion of a specialist is entitled to greater weight when the subject at issue concerns the particular field of the specialist's expertise.
In opposition, Turner asserts the court's determination that he met his burden of proof to establish a causal connection between the accident and his back injury has a reasonable factual basis in the record, and the record establishes the finding is not manifestly erroneous. The plaintiff had immediate onset of back pain at the time of the accident, which continued to become progressively worse until he sought treatment a month later, Further, Turner contends the court was not bound by the opinion of any expert because all *775 the medical experts in this case treated back injuries. Thus, the court was entitled to accept or reject the opinion expressed by any of the experts, based on the court's evaluation of the qualifications, credibility, and testimony of that expert. Accordingly, Turner argues the court did not err in accepting the opinion that his back injury was causally-related to the February 5, 2004 accident.
LAW AND ANALYSIS
Factual findings in worker's compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. "Thus, if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" [Citations omitted.]
Chaisson v. Cajun Bag & Supply Co., 97-1225, p. 8-9 (La.3/4/98), 708 So.2d 375, 380-381.
Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based an its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. [Citations omitted.]
Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
"A jury is not required to disregard testimony merely because the witness may be interested or biased. It is within the province of the trier of fact to place more probative value on the testimony of an interested witness than that of a disinterest [sic] one." Rosell, 549 So.2d at 848.
Experts' testimony may be given differing weights by the trier of fact depending on their qualifications and the facts upon which their opinions are based. For example, the general jurisprudential rule is that the diagnosis of the treating physician is entitled to more weight than that of a physician consulted solely for the purpose of litigation. Similarly, the testimony of a specialist is entitled to greater weight when the subject at issue concerns the particular field of the specialist's expertise. The trier of fact, however, "is not bound to accept the testimony of an expert whose testimony is presumptively given more weight if he finds the opinion is less credible than that of other experts." [Citations omitted.]
McClendon v. Keith Hutchinson Logging, 96 2373, pp. 11-12 (La.App. 1 Cir. 11/7/97), 702 So.2d 1164, 1172, writ denied, 97-2872 (La.2/13/98), 706 So.2d 995.
[T]he plaintiff-worker in a compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied:. (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following *776 the alleged incident. Corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses or friends.
In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of this testimony." The trial court's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error. Indeed, the manifest error/clearly wrong standard of appellate review applies in compensation actions even when the trial court's decision is based solely upon written reports, records or depositions.
Bruno v. Harbert Intern. Inc., 593 So.2d 357, 361 (La.1992). Only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Id.
Where a factfinder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Salvant v. State, 2005-2126, p. 5 (La.7/6/06), 935 So.2d 646, 650.
Here, the workers' compensation judge clearly found Lionel Turner's testimony as to how the accident happened and whether he fell after being struck credible, despite the conflicts with the testimony of Darren St. Pierre. We do not find manifest error in that determination. St. Pierre admitted he could not recall several crucial facts: whether he was on the fork-lift the entire time Turner was trying to unjam the palletizer; whether he may have operated the switch on the side of the machine, a location from which he admitted he would not have been able to see Turner at the time Turner was struck; what he said to Turner after the accident, although he remembered seeing Turner's bleeding mouth, bleeding gum, and loose tooth. St. Pierre testified he filled out an accident report, but could not explain several notations and completions on the report that he admitted were not in his handwriting. He did not recall whether he asked Turner what his injuries were; he only listed the injuries he himself observed.
Further, regarding the history of back pain given by Turner on the emergency room report and to the various doctors, as well as the doctors' testimony regarding the likelihood of causation, we find no manifest error in the court's conclusion that the injury was, causally related to the February 5, 2004 accident. The court obviously concluded that Turner was telling the truth about working in pain following the accident, until his pain became so great he sought emergency room treatment a month after the accident. The hypothetical questions posed to the various physicians varied as to the scenario of the accident and how the back pain might be related. The doctors' opinions were divergent.
Both Dr. Colvin and Dr. Lesser, however, indicated that the back injury could be related. Turner indicated he consistently had back pain following the accident, which only became intolerable three weeks later, and the court found him credible. Hence, there is no inconsistency in any of the opinions as to the causal relationship of the back condition to the accident.
For the foregoing reasons, the judgment is affirmed. Costs of this appeal are *777 assessed against the appellant, Delta Beverage Group/Pepsi Americas, Inc.
AFFIRMED
NOTES
[1] He is receiving Social Security disability payments.
[2] The judgment repeatedly lists the date of the accident as February 5, 2005, which clearly is a typographical error. We list it correctly in this opinion.
[3] The depositions submitted are of Doctors Robert Lesser, Keith Larkin, Warren Bourgeois, John Steck, and Meda Colvin, as well as the claimant's coworker, Darren St. Pierre.